**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x

**DARRI WOODHOUSE,**

                           **Plaintiff,**

       **-against-**

**CITY OF MOUNT VERNON, et al.,**


                        **Defendants.**

-----------------------------------------------------------x

**DARRI WOODHOUSE,**

                           **Plaintiff,**

       **-against-**

**WESTCHESTER COUNTY, et al.,**


                        **Defendants.**

-----------------------------------------------------------x

             *1-27-16*

    **1:13-cv-00189 (ALC) (HBP)**


    **1:13-cv-01165 (ALC) (HBP)**

    **ORDER AND OPINION**

**ANDREW L. CARTER, JR., United States District Judge:**

    *Pro se* plaintiff Darri Woodhouse brings two separate actions under 42 U.S.C. § 1983.[1] In

the first (the "Mount Vernon Action"), Plaintiff brings claims of false arrest, excessive force,

supervisory liability, and municipal liability against the City of Mount Vernon (the "City"), and

Detectives Patterson and Griffin and Police Officer John Doe in their individual and official

capacities. In the second (the "Westchester County Action"), Plaintiff brings claims of

inadequate medical care, violation of his First Amendment right to access the courts, violation of

the Americans with Disabilities Act ("ADA") and the Rehabilitation Act, and municipal liability

---

[1] For ease of reference, documents in the Mount Vernon Action are cited as "M.V. ____" and documents in the
Westchester County Action are cited as "W.C. ____".

COPIES MAILED

against Westchester County (the "County") and Sergeant Garrett in his individual and official

capacity; and claims of inadequate medical care, violation of the Americans with Disabilities Act

("ADA") and the Rehabilitation Act, and state law negligence against Correct Care Solutions

LLC, New York Correct Care Solutions-Medical Services P.C., and Nursing Director Michael

Kelly.

Defendants moved to dismiss Plaintiff's complaints, pursuant to Federal Rule of Civil

Procedure 12(b)(6). Their motions are GRANTED in part and DENIED in part.

## BACKGROUND

**I.      Mount Vernon**

The following facts are alleged in the complaints and are assumed to be true for the

purposes of this motion.

**a.  September 23, 2012, Incident**

On September 23, 2012, around 8:00 p.m., Woodhouse was walking east on Fourth Street in

Mount Vernon, when Detectives Patterson and Griffin appeared from behind a parked SUV and

approached him. (M.V. Compl. 4.) Griffin said, "Let me talk to you," and when Plaintiff replied,

"About what?" Griffin reached out and began choking Plaintiff. (Id.) At the same time, Griffin

yelled, "He has it in his mouth!" (Id.) Patterson grabbed Woodhouse's legs, at which point all

three men fell to the ground. (Id.) Woodhouse ended up lying on his stomach, and Griffin stood

over him, placed a knee on his back and continued to choke him. (Id.) Patterson grabbed

Woodhouse's right arm and placed his right knee on it, while holding his left knee to

Woodhouse's back. (Id.) Referring to Woodhouse's arm, Patterson yelled, "I'll fucking break it!"

(Id.) At this point, Griffin began using one hand to punch Woodhouse's face while using his

other hand to continue choking Woodhouse. (Id.) As Woodhouse moved his face away from

Griffin, Patterson also began hitting Woodhouse in the face. (Id.) Griffin yelled, "Spit it out!" and moved from choking Woodhouse to hitting his head against the concrete sidewalk. (Id.)

Woodhouse was arrested and transported to Mount Vernon City Jail. (M.V. Compl. 4.) Police alleged that Wodhouse had swallowed crack cocaine, but no drugs were ever located. (Id.) Woodhouse pled guilty to obstructing governmental administration. (Id. at 4-5). Upon his release from the jail, the detectives told him, "If you tell any [sic] we'll get you again." (Id. at 5.)

### b. October 9, 2012, Incident

On October 9, 2012, around 6:47 p.m., Woodhouse was walking north on Franklin Avenue in Mount Vernon, when several plainclothes police officers approached. (M.V. Compl. 5.) The officers were not displaying badges and Woodhouse did not know they were law enforcement. One of the officers, "Officer Doe," was a white man, about 5'8" and 140 pounds. (Id.) As Officer Doe approached Woodhouse from behind a black SUV, Detectives Griffin and Patterson appeared from behind Doe. (Id.) Doe ran toward Plaintiff and started to punch Woodhouse in the face. Griffin and Patterson joined, and the three hit Woodhouse with a metal baton. Woodhouse curled up to protect himself. (Id.) The Defendants continued to assault Woodhouse for approximately 10 minutes. (M.V. Compl. 5.) As a result, Woodhouse suffered a severe eye injury, an injury to his left eye socket, and bruises along his left leg and the left side of his back and stomach. (Id.) Woodhouse was eventually arrested and charged with tampering with evidence. (Id.) He requested medical attention from the Defendants but did not receive any. (Id.) The officers did not recover any drugs or evidence from Plaintiff. (Id.) However, Plaintiff pled to resisting arrest in order to be released from custody. (Id.)

As a result of the two incidents, Plaintiff received injuries including: injuries to his left eye; fractures to his face; impaired vision such that he sees spots; severe pain to his head and left

eye area, severe bruising to his left chin, left thigh, left side of his back, left and right arm, and neck area; and mental pain and anguish. (M.V. Compl. 3.) As a result of his injuries, he was prescribed glasses and pain medications. (Id.) Woodhouse contends that the City failed to supervise its employees, as it had a procedure and pattern of violating prisoners' civil rights by beating them and not getting them urgent medical attention. (M.V. Compl. 5-6.) He also alleges that there are several pending lawsuits against Mount Vernon in the Southern District of New York for similar civil rights violations, involving excessive force. (Id. at 6.)

## II.    Westchester County

On November 9, 2012, Woodhouse was transported to the Westchester County Jail by the Mount Vernon Police Department. (W.C. Compl. 3.) Prior to his arrival, Woodhouse had suffered injuries to his eye socket and cheekbone and the left side of his body, as a result of the incidents alleged in the Mount Vernon Action. (Id.) Upon admission, a sergeant photographed Woodhouse's injuries and Woodhouse was interviewed by an intake nurse. (Id.) Woodhouse was placed on a waiting list to see a doctor, and he was called to the jail clinic on or about November 15, 2012. (Id.) At that time, he was scheduled for an MRI at Mount Vernon Hospital. (Id.) On December 7, 2012, Woodhouse was transported to Mount Vernon Hospital for the MRI. (Id.) He received an MRI of his head and face area, and he was transported back to the jail without any results being disclosed to him. (Id.) On December 14, 2012, Woodhouse was transported to Westchester County Medical Center, in Valhalla, New York, where a doctor ordered an X-ray that revealed several facial fractures. (Id.) The doctor advised Woodhouse that because it had been 80 days since the injury occurred, he could not do anything. (Id. at 5.)

Once back at Westchester County Jail, Woodhouse wrote to the sick-call department about his injuries. (W.C. Compl. 5.) He was not called, so on December 16, 2012, he attempted

to submit a grievance to an unknown sergeant assigned to his housing unit. (Id.) The sergeant told Woodhouse, "That's not DOC it CCS write them [sic]," referring to Correct Care Solutions, the contracted medical provider. (Id.) Woodhouse then wrote to Correct Care Solutions and New York Correct Care Solutions, but received no response. (Id.) Finally, Woodhouse attempted to submit his grievance to Sergeant Garrett, who told him, "I'm tired of this stupid shit with these grievances," and refused to accept the grievance. (Id.) Woodhouse alleges that Sergeant Garrett's refusal to accept the grievance deprived him of his constitutional right to access the courts. (Id.)

Woodhouse alleges that Westchester County had a pattern or custom of violating prisoners' rights and that numerous similar claims are pending in the Southern District of New York. (W.C. Compl. 5-6). Woodhouse claims that a Department of Justice investigation identified violations by the Westchester County Jail and as a result of that investigation, the County contracted with a new provider but kept the same employees on. (Id.) Woodhouse specifically alleges that the County is aware that the medical care provider defendants had a pattern of delaying X-rays for days or weeks. (Id.)

**III.   Procedural Background**

Woodhouse filed his complaint in the Mount Vernon Action on January 7, 2013. (M.V. ECF No. 2.) The Mount Vernon Defendants filed a motion to dismiss the false arrest and supervisory and municipal liability claims on July 8, 2013 (M.V. ECF No. 13), and Woodhouse filed his opposition on August 20, 2013. (M.V. ECF No. 17.) On March 20, 2014, the Court denied the motion without prejudice and granted Woodhouse leave to amend his complaint. (M.V. ECF No. 29). Over the next year and a half, the Court granted Woodhouse numerous extensions of time to amend his complaint, but he never did so. (M.V. ECF Nos. 34, 37, 41, 43.) The Mount Vernon Defendants filed a second motion to dismiss all claims on April 1, 2015.

(M.V. ECF No. 46.) Woodhouse was to file his opposition by May 8, 2015, but he never did so, despite an additional Order from the Court. (M.V. ECF No. 51.)

Woodhouse filed his complaint in the Westchester County Action on February 20, 2013. The Correct Care Defendants filed a motion to dismiss on July 8, 2013 (W.C. ECF No. 13), and the Westchester County Defendants filed a motion to dismiss on August 2, 2013. (W.C. ECF No. 23.) Woodhouse filed his opposition to the Correct Care Defendants' motion on August 20, 2013 (W.C. ECF No. 29), and he did not file any opposition to the Westchester County Defendants. As in the Mount Vernon Action, on March 20, 2014, the Court denied the motions to dismiss without prejudice and granted Woodhouse leave to amend his complaint. (W.C. ECF No. 38.) The Correct Care Defendants and the Westchester County Defendants filed motions to dismiss on April 30, 2014 (W.C. ECF No. 39, 41), and the Court denied the motions without prejudice and granted Woodhouse additional time in which to amend his complaint. (W.C. ECF No. 47.) As in the Mount Vernon Action, Woodhouse never filed an amended complaint, despite numerous extensions of time. Both sets of Defendants filed the instant motions to dismiss on April 1, 2015. (W.C. ECF No. 60, 63.) As in the Mount Vernon Action, Woodhouse was to file his opposition by May 8, 2015, but he never did so, despite an additional Order from the Court. (W.C. ECF No. 68.) The Court now rules on the unopposed motions to dismiss.

## LEGAL STANDARD

### I.      Rule 12(b)(6)

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows

the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." Id.

For the purposes of a motion to dismiss, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. See Famous Horse Inc. v. 5th Ave. Photo Inc., 624 F.3d 106, 108 (2d Cir. 2010). However, the court need not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." Iqbal, 556 U.S. at 678, 681 (citing Twombly, 550 U.S. at 555). The complaint must provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock & iStone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555). To decide the motion, the court "may consider facts as asserted within the four corners of the complaint together with the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 64 (2d Cir. 2010) (internal quotation marks and citation omitted).

When presented with an unopposed motion, the court may not find for the moving party without reviewing the record and determining whether there is sufficient support for granting the motion. See Kinlaw v. Walsh, 10 Civ. 07539 (RMB) (JLC), 2012 WL 2548437, at *1 (S.D.N.Y. June 29, 2012); see also Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 246 (2d Cir. 2004) ( "[C]ourts, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law") (citation and internal quotation marks omitted). "[T]he sufficiency of a complaint is a matter of law that the court is capable of determining based on its

own reading of the pleading and knowledge of the law. If a complaint is sufficient to state a claim on which relief can be granted, the plaintiff's failure to respond to a Rule 12(b)(6) motion does not warrant dismissal." Edwards v. Horn, No. 10 Civ. 6194 (RJS), 2012 WL 760172, at *4 (quoting McCall v. Pataki, 232 F.3d 321, 322 (2d Cir. 2000)).

In cases brought by a *pro se* litigant, the Court must "construe [the] complaint liberally and interpret it to raise the strongest arguments that [it] suggest[s]." Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010) (citation and internal quotation marks omitted). Even so, the Court "cannot invent factual allegations that [the plaintiff] has not pled." Id.

## II.    The Prison Litigation Reform Act

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement applies to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002).

"[F]ailure to exhaust is an affirmative defense under the PLRA, and . . . inmates are not required to specially plead or demonstrate exhaustion in their complaints." Jones v. Bock, 549 U.S. 199, 216 (2007). Therefore, "[t]he Court may only grant a motion to dismiss based on failure to exhaust if non-exhaustion is clear from the face of the complaint." Rodriguez v. Warden, Metro. Corr. Facility, No. 13 Civ. 3643 (PAC), 2015 WL 857817, at *3 (S.D.N.Y. Feb. 27, 2015); see also McCoy v. Goord, 255 F.Supp.2d 233, 251 (S.D.N.Y. 2003) ("If nonexhaustion is clear from the face of the complaint (and incorporated documents), a motion to dismiss pursuant to Rule 12(b)(6) for failure to exhaust should be granted.")

## DISCUSSION

**I.    City of Mount Vernon**

In the Mount Vernon Action, Woodhouse brings claims of false arrest, excessive force, failure to supervise, and municipal liability under Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978) ("Monell"). Defendants move to dismiss all four claims. Defendants' motion is DENIED as to the excessive force claim and GRANTED as to the false arrest, failure to supervise, and Monell claims.

**a.  False Arrest**

Defendants move to dismiss Woodhouse's claims of false arrest on the basis that he eventually pled guilty to the offenses for which he was arrested. "When a Section 1983 plaintiff pleads guilty to the underlying or a lesser charge, this fact alone provides sufficient evidence that probable cause existed at the time of the arrest and precludes a false arrest claim under Section 1983." Hayes v. Cty. of Sullivan, 853 F. Supp. 2d 400, 428 (S.D.N.Y. 2012) (quoting Feurtado v. Gillespie, No. 04 Civ. 3405, 2005 WL 3088327, at *4 (E.D.N.Y. Nov. 17, 2005)) (internal quotation marks and alteration marks omitted); see also Cameron v. Fogarty, 806 F.2d 380, 388 (2d Cir. 1986) (applying the common-law rule that a plaintiff claiming false arrest "can under no circumstances recover if he was convicted of the offense for which he was arrested."). Because Woodhouse himself admits to pleading guilty to a charge of obstructing governmental administration arising out of his first arrest and a charge of resisting arrest arising out of his second arrest (M.V. Compl. 4, 5), the Court must GRANT Defendants' motions to dismiss Woodhouse's false arrest claims.

**b.  Excessive Force**

Defendants move to dismiss Plaintiff's claims of excessive force in violation of the Fourth Amendment in his two arrests. "A claim that excessive force was used . . . is subject to an objective test of reasonableness under the totality of the circumstances, which requires consideration of the specific facts in each case, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of others and whether he is actively resisting arrest." Sullivan v. Gagnier, 225 F.3d 161, 165 (2d Cir. 2000) (citing Graham v. Connor, 490 U.S. 386, 395-396 (1989)). The "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Brown v. City of New York, 798 F.3d 94, 100 (2d Cir. 2015), 798 F.3d at 100 (citing Graham, 490 U.S. at 397). Granting "a motion to dismiss an excessive force claim is appropriate if, accepting all of the allegations as true, it is clear that the force used by the officers was objectively reasonable under the circumstances." Jones v. Rivera, No. 13 Civ. 1042 (NSR), 2015 WL 8362766, at *5 (S.D.N.Y. Dec. 7, 2015) (citing Messina v. Mazzeo, 854 F. Supp. 116, 128-29 (E.D.N.Y. 1994)).

### i. Effect of Woodhouse's Convictions

Defendants first contend that because "Plaintiff pled guilty to obstructing governmental administration and resisting arrest . . . Plaintiff concedes that some degree of force was necessary." (M.V. Mot. 9.) But there is no "per se rule that an arrestee's refusal to submit to the easy application of handcuffs always permitted police officers to use substantial force." Brown, 798 F.3d at 102. "Indeed, by focusing only on resistance to the arrest, such a rule would disregard the three-factor analysis that the Supreme Court required in Graham. Even resistance sufficient to result in conviction for resisting arrest does not preclude a finding of 'excessive force in effectuating the arrest.'" Id. (quoting Sullivan, 225 F.3d at 166). The same is true for his

obstructing governmental administration charge. See, e.g., Tribie v. Parwanta, No. 10 Civ. 6016 (VB), 2012 WL 246619, at *7 (S.D.N.Y. Jan. 26, 2012) (denying summary judgment where plaintiff alleged excessive force in arrest for obstructing governmental administration).

Only if the "facts actually determined in his criminal conviction that were necessary to the judgment of conviction are incompatible with the claim of excessive force" would the claim be precluded. Sullivan, 225 F.3d at 166. Here, the crimes to which Woodhouse pled do not include violence—or threats thereof—as essential elements. See, e.g. People v. Bryant, 199 A.D.2d 329, 329 (2d Dep't 1993) (holding that evidence against defendant who fled from site of crime and was pursued by police was sufficient to sustain conviction for resisting arrest); People v. Dumay, 23 N.Y.3d 518, 524 (N.Y. 2014) (finding factual allegations in information sufficient to support obstructing governmental administration charge, where information alleged that defendant slammed the trunk of police car and stood behind car preventing it from moving). At this stage, relying only on Plaintiff's complaint, the Court sees no basis to find that Woodhouse's convictions are incompatible with his claim of excessive force.

Taking Woodhouse's allegations as true, it is not clear that the force used by the officers was objectively reasonable under the circumstances. In neither arrest was Woodhouse engaged in any behavior that posed an immediate threat to the safety of others; per his complaint, he alleges that he was walking the streets of Mount Vernon, at which point officers approached him and began assaulting him. Further, any criminal activity he was engaged in was nonviolent. Woodhouse himself does not admit to any criminal activity in the complaint, and his convictions were only for resisting arrest and obstructing governmental administration, not any underlying crime. Even if Woodhouse had the drugs the officers apparently believed him to have (M.V.

Compl. 4), this conduct was not immediately threatening. Accordingly, the first two <u>Graham</u> factors tilt in Woodhouse's favor.

As to the third factor—whether Woodhouse resisted arrest—"The fact that a person whom a police officer attempts to arrest resists, threatens, or assaults the officer no doubt justifies the officer's use of *some* degree of force, but it does not give the officer license to use force without limit." <u>Sullivan</u>, 225 F.3d at 165 (emphasis in original). Even though Woodhouse apparently did not cooperate with officers, the amount of force allegedly used was not objectively reasonable in either incident: in the first, Woodhouse claims that the officers choked him, threw his body to the ground, punched his face, applied pressure to and threatened to break his arm, and slammed his head against the sidewalk; in the second, Woodhouse claims the officers beat him with a metal baton for ten minutes. (M.V. Compl. 4-5.) Regardless of whether Woodhouse is ultimately able to prove these allegations, the allegations in his complaint describe force that was not objectively reasonable under the circumstances.

### ii.    Qualified Immunity

Defendants next claim that they are entitled to qualified immunity on the excessive force claim. "It is well established that qualified immunity may operate as a defense to excessive force claims." <u>Mesa v. City of New York</u>, No. 09 Civ. 10464 (JPO), 2013 WL 31002, at *17 (S.D.N.Y. Jan. 3, 2013) (citing <u>Finnegan v. Fountain</u>, 915 F.2d 817, 822–23 (2d Cir. 1990)). "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." <u>Ashcroft v. al-Kidd</u>, 131 S.Ct. 2074, 2080 (2011) (citing <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). Since Woodhouse sufficiently alleged a claim of excessive force, the Court addresses only the second

prong here. See Pearson v. Callahan, 555 U.S. 223, 236 (2009) (courts may determine order in which two prongs are analyzed). "[I]t is beyond dispute that the right to be free from excessive force has long been clearly established." Read v. Town of Suffern Police Dep't, No. 10 Civ. 9042 (JPO), 2013 WL 3193413, at *7 (S.D.N.Y. June 25, 2013) (quoting Green v. Montgomery, 219 F.3d 52, 59 (2d Cir. 2000)) (internal citation omitted). The claim may not be dismissed on qualified immunity grounds because Woodhouse sufficiently alleged a claim of excessive force and the right to be free from excessive force is clearly established. Defendants' motion to dismiss Woodhouse's excessive force claims is DENIED.

### c.  Supervisory Liability

Defendants also move to dismiss Woodhouse's claims of supervisory liability. It is unclear against whom Woodhouse asserts this claim, but the Court will treat it as if it is asserted against the individual officers, as claims against the County are analyzed under Monell.

"Section 1983 does not give rise to *respondeat superior* liability against the employer of a person who infringes upon another's constitutional rights. But a supervisor may be held liable if he or she was personally a 'direct participant' in the constitutional violation." Terebesi v. Torreso, 764 F.3d 217, 233-34 (2d Cir. 2014) (citing Ashcroft v. Iqbal, 556 U.S. 662, 676; Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003)) (internal citations omitted). "[A] 'direct participant' includes a person who authorizes, orders, or helps others to do the unlawful acts, even if he or she does not commit the acts personally." Id. (citing Provost v. City of Newburgh, 262 F.3d 146, 155 (2d Cir. 2001); Gronowski v. Spencer, 424 F.3d 285, 293-94 (2d Cir. 2005)). "[A] supervisory official cannot be liable solely on account of the acts or omissions of his or her subordinates." Bellamy v. Mount Vernon Hosp., No. 07 Civ. 1801 (SAS), 2009 WL 1835939, at *4 (S.D.N.Y. June 26, 2009). Plaintiff's complaint does not contain any allegations that any of

the individual defendants acted in a supervisory capacity. For that reason alone, Defendants'
motion to dismiss any claim of supervisory liability against the individual defendants is
GRANTED.

### d. Municipal Liability Under Monell

Finally, the Mount Vernon Defendants move to dismiss Woodhouse's claim of municipal
liability. "Congress did not intend municipalities to be held liable [under § 1983] unless action
pursuant to official municipal policy of some nature caused a constitutional tort." Monell v.
Dep't of Social Svcs., 436 U.S. 658, 691 (1978). "[T]o hold a city liable under § 1983 for the
unconstitutional actions of its employees, a plaintiff is required to plead and prove three
elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a
denial of a constitutional right." Wray v. City of N.Y., 490 F .3d 189, 195 (2d Cir. 2007)
(quoting Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983)) (internal quotations marks
omitted). Normally, "a custom or policy cannot be shown by pointing to a single instance of
unconstitutional conduct by a mere employee of the [municipality]." Newton v. City of New
York, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008). In addition, "[u]nless a plaintiff shows that he
has been the victim of a federal law tort committed by persons for whose conduct the
municipality can be responsible, there is no basis for holding the municipality liable. Monell
does not create a stand-alone cause of action under which a plaintiff may sue over a
governmental policy, regardless of whether he suffered the infliction of a tort resulting from the
policy." Askins v. Doe No. 1, 727 F.3d 248, 253 (2d Cir. 2013).

A plaintiff may satisfy the "policy or custom" requirement by alleging one of the
following:

> "(1) a formal policy officially endorsed by the municipality; (2) actions taken by
> government officials responsible for establishing the municipal policies that caused the

14

particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees."

Brandon v. City of New York, 705 F.Supp. 2d 261, 276-77 (S.D.N.Y. 2010). "To survive a motion to dismiss, Plaintiff cannot, through conclusory allegations, merely assert the existence of a municipal policy or custom, but must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." Tieman v. City of Newburgh, No. 13 Civ. 4178 (KMK), 2015 WL 1379652, at *13 (S.D.N.Y. Mar. 26, 2015) (citing Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir. 1993); Santos v. New York City, 847 F.Supp.2d 573, 576 (S.D.N.Y. 2012)) (internal quotation marks omitted).

Woodhouse may only attempt to establish municipal liability based on the excessive force claims, as the false arrest claims have been dismissed. See Askins, 727 F.3d at 253. Woodhouse alleges that the City of Mount Vernon failed to supervise its employees, and had "a policy procedure and a pattern" of excessive force. (M.V. Compl. 5-6.) This seems to implicate the first, third, and fourth categories of methods of proving a "policy or custom." Addressing those categories one at a time, as to the first—a formal policy—Woodhouse "through conclusory allegations, merely assert[s] the existence of a municipal policy . . ." Tieman, 2015 WL 1379652, at *13. He provides no support for the notion that Mount Vernon had adopted a formal policy of excessive force, so his complaint cannot stand on that ground. See Moore v. City of New York, No. 08 Civ. 8879 (PGG), 2010 WL 742981, at *6 (S.D.N.Y. March 2, 2010) ("Allegations that a defendant acted pursuant to a policy or custom without any facts suggesting the policy's existence, are plainly insufficient.") (internal quotation marks omitted).

15

As to the third category—a consistent practice of use of excessive force that supervisors were aware of and tolerated—Woodhouse provides slightly more support. He claims that there are "several claims" pending against the City for similar "excessive force police brutality." However, Woodhouse's complaint is silent as to the allegations contained in these lawsuits, the timeframe of them, the outcome, the people involved, or any information that would assist the Court in identifying the suits. Even where plaintiffs present evidence of other identifiable suits, "[a]llegations of complaints about similar conduct [are] insufficient to state a claim for a widespread custom under Monell because 'the number of complaints filed, without more, indicates nothing,' as 'people may file a complaint for many reasons, or for no reason at all' . . ." Tieman, 2015 WL 1379652 (quoting Strauss v. City of Chicago, 760 F.2d 765, 768–69 (7th Cir. 1985)) (internal alteration marks omitted); see also Walker v. City of New York, 12 Civ. 5902 (PAC), 2014 WL 1259618, at *3 (S.D.N.Y. March 18, 2014) (holding, where plaintiff alleged that ten similar complaints had been filed in previous ten years, that "[t]he paltry number of complaints (none resulting in an adjudication of liability), spread over a period so long in a city so large, hardly suggests the frequency or pervasiveness of the purported custom that is required to state a Monell claim"); Collins v. City of New York, 923 F.Supp. 2d 462, 479 (E.D.N.Y. 2013) (holding that a "litany of other police-misconduct cases" discussed in the plaintiff's complaint was "insufficient to make a plausible case for Monell liability," because the complaints were different from the misconduct alleged in the complaint, post-dated the alleged misconduct in the case, or "involve[d] something less (settlements without admissions of liability and unproven allegations) than evidence of misconduct"). Because he presents no allegations other than the vague reference to other lawsuits, Woodhouse's allegations fall short of establishing a facially plausible case that the City had a consistent custom of excessive force.

16

Finally, as to the fourth category of a policy or custom—a failure to train or supervise to such an extent that it amounts to deliberate indifference—Woodhouse provides nothing more than a conclusory statement that he brings a claim "for failure to supervise it's [sic] employees which resulted in a violation" of his constitutional rights. (M.V. Compl. 5.) A failure to act, train, or supervise can constitute a municipal custom "only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need." Reynolds v. Giuliani, 506 F.3d 183, 192 (2d Cir. 2007) (citing City of Canton, Ohio v. Harris, 489 U.S. 378, 390 (1989)). Woodhouse's allegation is insufficient to make out a Monell claim under a failure to supervise theory. See Bradley v. City of New York, No. 08 Civ. 1106, 2009 WL 1703237, at *3 (E.D.N.Y. June 18, 2009) ("The Complaint's conclusory, boilerplate language—that the City 'fail[ed] to adequately train, discipline, and supervise' employees and 'fail[e]d to promulgate and put into effect appropriate rules and regulations applicable to the duties and behavior' of its employees—is insufficient to raise an inference of the existence of a custom or policy . . .") (internal citations omitted). Because Woodhouse's complaint does not sufficiently plead a custom or policy under any theory, the City of Mount Vernon's motion to dismiss his municipal liability claims must be GRANTED.

## II.   Westchester County

In the Westchester Action, Woodhouse brings claims against two separate groups of defendants: Westchester County and Sergeant Garrett (the "County Defendants"); and the private provider with whom Westchester County contracts to provide medical care, Correct Care Solutions LLC, New York Correct Care Solutions-Medical Services, P.C., and Nursing Director Michael Kelly (the "Correct Care Defendants").

### a. County Defendants

Against Westchester County and Sergeant Garrrett, Woodhouse brings claims of inadequate medical care; denial of access to courts in violation of the First Amendment; municipal liability under Monell; and violations of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. The County Defendants argue that all claims must be dismissed due to Woodhouse's failure to comply with the PLRA exhaustion requirement and that the First Amendment claim based on denial of access to the grievance process must be dismissed because it is not actionable under § 1983. Defendants' motion to dismiss on non-exhaustion grounds is DENIED as to all Woodhouse's claims; however, their motion to dismiss the First Amendment claim is GRANTED.

### i. Non-Exhaustion Under the PLRA

The County Defendants move to dismiss based on Woodhouse's alleged failure to exhaust his administrative remedies. (Westchester County Mot. to Dismiss ("W.C. Mot.") 1.) But "[t]he Court may only grant a motion to dismiss based on failure to exhaust if non-exhaustion is clear from the face of the complaint." Rodriguez, 2015 WL 857817, at *3.

Defendants assert that Woodhouse's complaint establishes he did not comply with Westchester County Detention Center's "well-established and comprehensive grievance program." (W.C. Mot. 5.) Woodhouse does state in his complaint that he attempted to file a grievance with an unknown sergeant and with Sergeant Garrett on December 16, 2012, that the sergeants refused to accept the grievance, and that their refusals "denied plaintiff access to the courts" because "plaintiff has to submit a grievance to exuast his remidies [sic] as per prison litigation reform act." (W.C. Compl. 5.) But for several reasons, Woodhouse's pleading does not make his non-exhaustion facially apparent.

First, the refused grievance complained only that the results of Woodhouse's X-ray had not been conveyed to him and that prior to December 14, 2012, he had not been told he had several fractures in his left cheek and eye socket. (Exh. 2, W.C. Compl.) As remedies, he requested prompt attention from an orthopedic doctor and access to pain medication. (Id.) While these allegations form part of the basis OF Woodhouse's inadequate medical treatment claim, they do not form the entirety of it: he also alleges that treatment for *all* his injuries was inadequate, that treatment was delayed prior to December 14, and that he was denied access to his MRI results. Further, Woodhouse's Monell claim and ADA claim are entirely separate from the matters mentioned in the grievance. For these other claims, Woodhouse provides no information about any steps he took to grieve them. "If exhaustion is not an affirmative pleading requirement, then plaintiff[] cannot be penalized for what [he] do[es] not say in [his] pleadings about [his] efforts to exhaust." McNair v. Rivera, No. 12 Civ. 6212 (ALC) (SN), 2013 WL 4779033, at *4-6 (S.D.N.Y. Sept. 6, 2013).

Second, as to those claims the rejected grievance does address, it is still not clear from the face of the complaint that Woodhouse failed to exhaust them. While it is true that a prison or jail's own grievance requirements "define the boundaries of proper exhaustion," Espinal v. Goord, 558 F.3d 119, 124 (2d Cir. 2009), Woodhouse's complaint does not describe that process.[2] While Woodhouse does state that his grievance was rejected, he also states that he "appealed to the commissioner and to the citizen's policy review complaint counsel." (W.C.

---

[2] Defendants' submission also does not fully describe the process. (W.C. Mot. 6). Even if it did, however, the Court could not consider those additional materials on a motion to dismiss and would have to decide whether to treat the motion as one for summary judgment. Pratt v. City of New York, 929 F. Supp. 2d 314, 319 (S.D.N.Y. 2013). "If the Court were to treat this motion as a motion for summary judgment, the parties would be entitled to an opportunity to take discovery and submit additional relevant evidence, and the parties have not yet been allowed such an opportunity." Id. (citing Hernández v. Coffey, 582 F.3d 303, 309 (2d Cir. 2009)) (declining to convert a motion to dismiss to a motion for summary judgment where non-exhaustion was not facially clear).

Compl. 4.) Without knowing the contours of the grievance process, it is impossible to determine from the complaint whether by the steps Woodhouse took, he properly grieved his claim pursuant to the county jail's procedures. "The scope of proper. . . grievance procedure [and] whether the plaintiff followed that procedure properly . . ." should be determined on a motion for summary judgment under Rule 56, not a motion to dismiss under Rule 12(b)(6). Pratt v. City of New York, 929 F. Supp. 2d 314, 319 (S.D.N.Y. 2013).

As the parties recognize, even if Woodhouse did fail to exhaust his administrative remedies, the sergeants' alleged refusal to accept his grievances may constitute special circumstances that would excuse the plaintiff's non-exhaustion. See Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004) (explaining that "special circumstances may justify a prisoner's failure to comply with administrative procedural requirements") (quoting Giano v. Goord, 380 F.3d 670, 676 (2d Cir. 2004) (internal quotation marks and alteration marks omitted). However, because the complaint does not establish that Plaintiff failed to exhaust, the Court does not now need to reach the question of whether special circumstances excuse non-exhaustion. Defendants' motion to dismiss on non-exhaustion grounds is DENIED.

ii.   **Access to Grievances**

Defendants also move to dismiss Woodhouse's First Amendment claim. (W.C. Mot. 7.) Woodhouse argues that Sergeant Garret's refusal of his grievance "denied plaintiff access to the courts violating his constitutional rights to access to the courts." (County Compl. 5.) However, "[a] prisoner has no constitutional right to a prison grievance procedure or to have his grievances investigated." Hayes v. Cty. of Sullivan, 853 F. Supp. 2d 400, 434 (S.D.N.Y. 2012). Woodhouse "has a First Amendment right to access the courts, but the constitution does not similarly protect

his right to access a prison grievance system." Hernandez v. Goord, No. 01 Civ. 9585 (SHS), 2013 WL 2355448, at *9 (S.D.N.Y. May 29, 2013) (collecting cases).

Woodhouse argues that the refusal of his grievance denied his access to courts, as it hobbled his ability to comply with the PLRA exhaustion requirement. However, "to the extent that the plaintiff lacked 'available' administrative remedies," due to behavior of defendants that rendered administrative remedies unavailable, "the PLRA's exhaustion requirement is inapplicable." Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004). Therefore, the County Defendants' alleged refusal to accept Woodhouse's grievances only blocked his access to the grievance process; it did not block his access to the courts. Even with the PLRA exhaustion requirement, "inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983." Cancel v. Goord, No. 00 Civ. 2042 (LMM), 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001). For that reason, the Court GRANTS the motion to dismiss Plaintiff's First Amendment claim.

### b. Correct Care Defendants

Against the Correct Care Defendants, Woodhouse brings claims of inadequate medical care; violations of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and a state law negligence claim.[3]

### i. Inadequate Medical Care

The Correct Care Defendants move to dismiss Woodhouse's claim that he was provided inadequate medical care. As an initial matter, "[b]ecause plaintiff is a pretrial detainee in state custody, he receives protection against mistreatment at the hands of prison officials under the

---

[3] The Correct Care Defendants argue that, "to the extent if at all, [Woodhouse] purports to assert so-called 'Monell claims' against the moving defendants, they too must fail." (Correct Care Mot. to Dismiss ("C.C. Mot.") 8.) However, Woodhouse does not raise a Monell claim against the Correct Care Defendants; instead, he bases his Monell claim against the *County* on the conduct of the Correct Care Defendants. (W.C. Compl. 6.)

Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, which is applicable only to convicted prisoners." Roberts v. C-73 Med. Dir., No. 14 Civ. 5198 (GHW), 2015 WL 4253796, at *3 (S.D.N.Y. July 13, 2015) (quoting Caiozzo v. Koreman, 581 F.3d 63, 69 (2d Cir. 2009)) (internal quotation marks and alterations omitted). While Woodhouse pleads an Eighth Amendment claim, the Court understands it to be a Fourteenth Amendment claim.

"In order to establish an Eighth [or Fourteenth] Amendment claim arising out of inadequate medical care, a prisoner [or pretrial detainee] must prove 'deliberate indifference to his serious medical needs.'" Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)) (internal alteration marks omitted). Deliberate indifference has two prongs: "First, the alleged deprivation must be, in objective terms, sufficiently serious. Second, the defendant must act with a sufficiently culpable state of mind." Id. (internal citation omitted).[4] "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Id. (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)); see also Caizzo, 581 F.3d at 65-66.

---

[4] This Court applies a subjective standard to Woodhouse's Fourteenth Amendment claim of deliberate indifference to his serious medical needs, just as it would to an Eighth Amendment claim brought by a convicted prisoner. See Caiozzo, 581 F.3d at 69. This is so despite the Supreme Court's recent decision in Kingsley v. Hendrickson, holding that "the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one," 135 S.Ct. 2466, 2473 (2015), rather than the subjective standard that a convicted prisoner bringing an excessive force claim must meet under Hudson v. McMillian, 503 U.S. 1, 6-7 (1992). However, the Second Circuit has held that "due process does not require more than the Eighth Amendment." Roberts, 2015 WL 4253796, at *3, n. 3 (citing Arroyo v. Schaefer, 548 F.2d 47, 50 (2d Cir. 1977) (internal citation omitted). Because "the Eighth Amendment still requires intent[,] the Fourteenth Amendment requires no more. The Fourteenth Amendment standard here only changes if the Supreme Court changes the Eighth Amendment floor." Id; see also Gilbert v. Rohana, 14 Civ. 630, 2015 WL 6442289, at *3-4 (S.D. Ind. Oct. 23, 2015) (applying deliberate indifference standard to pretrial detainee's medical needs claim post-Kingsley ); Austin v. Cnty. Of Alameda, No. 15-cv-763,, 2015 WL 4051997, at *3 (N.D.Cal. July 2, 2015) (same); McBride v. Houston Cnty. Health Care Auth., No. 12-cv-1047, 2015 WL 3892715, at *15 (M.D.Ala. June 24, 2015) (same)..

As to the objective prong, "[t]here is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003). Courts should look to factors like: "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." Chance, 143 F.3d at 702 (internal alteration omitted). The medical need must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." Johnson v. Wright, 412 F.3d 398, 403 (2d Cir. 2005).

Where the plaintiff alleges "an unreasonable delay or interruption in treatment" rather than a complete denial of treatment, "the seriousness inquiry focuses on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone." Salahuddin v. Goord, 467 F.3d 263, 279-80 (2d Cir. 2006) (quoting Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003)) (emphasis in original). "[I]t's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant." Smith, 316 F.3d at 186. "Where temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in this Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness." Ferguson v. Cai, No. 11 Civ. 6181 (PAE), 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012) (collecting cases); see also Bell v. Jendell, 980 F.Supp.2d at 560 (S.D.N.Y. 2013) (5-day delay in care of acid reflux was sufficiently serious where plaintiff alleged that he suffered symptoms—including vomiting while sleeping—as a result of the delay); Roberts, 2015 WL 4253796, at *4 (Delay of less than ten days was sufficiently serious where plaintiff alleged

that his diabetes went untreated and as a result, his medical condition worsened and his pain

increased, resulting in "prolong[ed] pain, suffering, and continuing health problems").

"Although adverse medical effects are not required to prove a constitutional violation . . .

in most cases, the actual medical consequences that flow from the alleged denial of care will be

highly relevant to the question of whether the denial of treatment subjected the prisoner to a

significant risk of serious harm." Hamm v. Hatcher, No. 05 Civ. 503 (ER), 2013 WL 71770, at

*8 (S.D.N.Y. Jan. 7, 2013) (quoting Smith, 316 F.3d at 187, 188). "Thus, as the Second Circuit

has recognized, "the 'seriousness' determination in . . . denial of medical care cases will often be

ill-suited for resolution at the pleading stage and will have to await summary judgment

proceedings, at which point a fully developed medical record will inform the court as to the

nature of the inmate's condition." Roberts, 2015 WL 4253796, at *4, n. 4 (quoting Smith, 316

F.3d at 188, n. 14).

At this early stage, and construing Woodhouse's *pro se* complaint liberally, he has made

out the objective prong of deliberate indifference, alleging a sufficiently serious medical need

that went unaddressed by Defendant Michael Kelly, Nursing Director of Correct Care. Upon his

arrival at the Westchester County Jail on November 9, 2012, Woodhouse had injuries to his face

and the left side of his body, documented by the intake nurse. (M.V. Compl. 4.) Nearly a week

went by before he was seen in the jail's clinic, on November 15, 2012. (Id.) After that, he

alleges, three more weeks elapsed before he was transported to the hospital on December 7,

2012, for an MRI to his head and neck. (Id.) Finally, two days later, Woodhouse alleges he met

with a doctor who specifically mentioned the delay in treatment as a reason why he could not

effectively treat Woodhouse. (Id.)

Woodhouse's condition, as pled, was of "urgency, one that may produce . . . degeneration, or extreme pain." Johnson, 412 F.3d 398. He indicates he was in "severe pain" and his alleged injuries, ranging from facial fractures to vision problems, were of the sort "that a reasonable doctor or patient would find important and worthy of comment or treatment." Chance, 143 F.3d at 702. This is not, however, the end of the inquiry, as for claims like Woodhouse's, "the seriousness inquiry focuses on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone." Salahuddin, 467 F.3d at 279-80. Here, Woodhouse sufficiently alleges "the particular risk of harm faced by [Woodhouse] due to the challenged deprivation of care." Smith, 316 F.3d at 186. He alleges that precisely because his care was delayed, his facial injury was exacerbated to a point of irreparability. The Correct Care Defendants argue that this exacerbation was due to treatment delay pre-dating Woodhouse's arrival at the jail; however, the doctor's statement, as pled by Woodhouse, is not so detailed as to support that conclusion. Such a dispute is more appropriate for a motion for summary judgment. As alleged by Woodhouse, the delay caused him to continue to suffer extreme pain for his first month at the jail and it exacerbated his serious condition. See Ferguson, 2012 WL 2865474, at *4. This is enough to make out the objective prong of Woodhouse's claim at this point.

But Woodhouse must also make out a plausible claim that the Defendants "act[ed] with a sufficiently culpable state of mind." Chance, 143 F.3d at 702. "The required state of mind, equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the

inference." Hemmings v. Gorczyk, 134 F.3d 104, 108 (2d Cir. 1998) (internal quotation marks and citation omitted).

Woodhouse does not make out such a claim here. He alleges that when he arrived at the facility, he met with an intake nurse and had his injuries photographed by a sergeant. (M.V. Compl. 4). At that point, he was placed on a waiting list to see a doctor. (Id. 4). With these allegations, Woodhouse may sufficiently establish that Defendants were aware of facts from which the inference could be drawn that a substantial risk of serious harm exists. However, he falls short of making a facially plausible showing that Defendants either actually drew that inference or disregarded an excessive risk to his health or safety. To the contrary, Woodhouse acknowledges that in the month he was at the jail, Defendants referred him to a series of medical professionals to further assess his condition. This does not support a contention that Correct Care acted with deliberate indifferent. "A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference." Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F.Supp.2d 303, 311-12 (S.D.N.Y. 2001) (citing Chance, 143 F.3d at 703); see also Brown v. McElroy, 160 F.Supp.2d 699, 706 (S.D.N.Y. 2001) ("[T]he fact that a plaintiff feels that more should have been done for his condition is not a sufficient basis for a deliberate indifference claim."). Absent allegations to support the subjective deliberate indifference prong, Woodhouse's Fourteenth Amendment claim of inadequate medical care must be dismissed. Correct Care Defendants' motion to dismiss this claim is GRANTED.

## ii.    Section 504 and Americans with Disabilities Act

The Correct Care Defendants also seek to dismiss Woodhouse's ADA and Rehabilitation Act claim. The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any such entity."

42 U.S.C.S. § 12132. Section 504 of the Rehabilitation Act provides that "[n]o otherwise

qualified individual with a disability in the United States . . . shall, solely by reason of her or his

disability, be excluded from the participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial assistance or under any

program or activity conducted by any Executive agency." 29 U.S.C.S. § 794. "The purposes of

the ADA and Rehabilitation Act are to eliminate discrimination on the basis of disability and to

ensure evenhanded treatment between the disabled and the able-bodied." Poulos v. City of New

York, No. 14 Civ. 3023 (LTS), 2015 WL 5707496, at *8 (S.D.N.Y. Sept. 29, 2015) (quoting Doe

v. Pfrommer, 148 F.3d 73, 82 (2d Cir. 1998) (internal quotation marks and alteration marks

omitted). "While there are differences between the statutes, unless one of those subtle

distinctions is pertinent to a particular case, courts in this Circuit treat claims under the two

statutes identically." Id. (quoting Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003))

(internal quotation marks and alteration marks omitted).

To establish a violation of Title II of the ADA, a plaintiff must establish "(1) that he is a

'qualified individual' with a disability; (2) that he was excluded from participation in a public

entity's services, programs or activities or was otherwise discriminated against by a public entity;

and (3) that such exclusion or discrimination was due to his disability." Mary Jo C. v. New York

State & Local Ret. Sys., 707 F.3d 144, 153 (2d Cir. 2013). To state a claim under the

Rehabilitation Act, Plaintiff must satisfy the additional element of demonstrating that the

defendant entity receives federal funding. Harris v. Mills, 572 F.3d 66, 73–74 (2d Cir. 2010).

Woodhouse does not plead any of these elements. His complaint includes a single passing

reference, alleging, "defendants violated the americans with disabilities act section 504." This is

the very definition of a conclusory allegation. Therefore, the Correct Care Defendants' motion to dismiss this claim is GRANTED.

### iii.    State Law Negligence Claim

Finally, the Correct Care Defendants move to dismiss Woodhouse's claim of negligence, based on his allegation that "the wait [for medical care] was so long it resulted in [the] denial of medical attention." (M.V. Compl. 7.) To establish a claim of negligence under New York law, the plaintiff must show: "(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." Pasternack v. Lab. Corp. of Am., 892 F.Supp.2d 540, 552 (S.D.N.Y.2012) (quoting Alfaro v. Wal–Mart Stores, Inc., 210 F.3d 111, 114 (2d Cir. 2000)). As with his ADA claim, Woodhouse includes but one conclusory reference to this claim in his complaint. More specifically, he does not allege anywhere that any of the Defendants owed a duty to him or breached any duty. The Correct Care Defendants' motion to dismiss this claim is GRANTED.

## CONCLUSION

For the reasons set forth above, all claims against the City of Mount Vernon, Correct Care Solutions LLC, New York Correct Care Solutions-Medical Services P.C., and Nursing Director Michael Kelly are dismissed with prejudice. Likewise, the claims of false arrest and supervisory liability against Detectives Patterson and Griffin and Police Officer Doe, and the First Amendment claim against Westchester County are dismissed with prejudice. However, Woodhouse's excessive force claim against Detectives Griffin and Patterson and Officer Doe survives, and Woodhouse's inadequate medical care claim and Americans with Disabilities Act and Rehabilitation Act claims against Westchester County survive.

The Court will hold a status conference to address the remaining claims and any next steps in the proceedings on **February** 4 **, 2016, at** 11 **:** 30 a **.m.** All remaining parties (and/or counsel) should appear in person in Courtroom 1306 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, NY, on the date and time specified above.

**SO ORDERED.**

**Dated:**        January 26 , 2016
               New York, New York

_____
**HON. ANDREW L. CARTER, JR.**
**United States District Judge**